853 F.2d 1452
 57 USLW 2105
 Jane HODGSON, M.D.; Arthur Horowitz, M.D.; Nadine T.,
Janet T., Ellen Z., Heather P., Mary J., Sharon L., Kathy
M., and Judy M. individually and on behalf of all other
persons similarly situated; Diane P., Sarah L. and Jackie
H.; Meadowbrook Women's Clinic, P.A., Planned Parenthood of
Minnesota, a nonprofit Minnesota corporation; Midwest
Health Center for Women, P.A., a nonprofit Minnesota
corporation; Women's Health Center of Duluth, P.A., a
nonprofit Minnesota corporation, Appellees,
v.
The STATE OF MINNESOTA; Rudy Perpich as Governor of the
State of Minnesota; Hubert H. Humphrey, III, as
Attorney General of the State of
Minnesota, Appellants.
 Nos. 86-5423, 86-5431.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 12, 1988.
Decided Aug. 8, 1988.
Rehearing En Banc Denied Sept. 23, 1988.
 
 John B. Galus, St. Paul, Minn., for appellants.
 Janet Benshoof, New York City and William Z. Pentelovitch, Minneapolis, Minn., for appellees.
 Before LAY, Chief Judge, and HEANEY, McMILLIAN, ARNOLD, JOHN R. GIBSON, FAGG, BOWMAN, WOLLMAN, MAGILL and BEAM, Circuit Judges, En Banc.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 The issue before us is the constitutionality of a Minnesota statute which requires a pregnant minor to notify her parents of her desire to obtain an abortion or to seek judicial bypass. The statute, Minn.Stat.Ann. Secs. 144.343(2)-(7) (1987), requires a minor to notify both parents at least forty-eight hours before a planned abortion or demonstrate to a court in an expedited confidential proceeding either that she is "mature and capable of giving informed consent" or that the performance of an abortion without such notification would be in her "best interests." The district court held that the notice/bypass statute was unconstitutional because the two-parent notice requirement failed to serve the state's interest in protecting pregnant minors or promoting family communication and that the 48-hour waiting period requirement was unreasonable under conditions existing in Minnesota. A panel of this court affirmed the judgment of the district court and we granted rehearing en banc. We now reverse and remand with directions that the district court enter judgment that the notice/bypass statute is constitutional.
 
 
 2
 In 1981, the Minnesota legislature enacted Minn.Stat.Ann. Sec. 144.343, which deals generally with minor's consent to treatment for pregnancy, venereal disease, and alcohol and drug abuse.[1] Subd. 2 provides that no abortion may be performed upon an unemancipated minor until at least 48 hours after written notice to her parent[2] and provides the mechanics for effecting notice.[3] Subd. 6 provides that if the notification provision of subd. 2 is restrained by judicial order, which as we will discuss occurred here, then a pregnant minor has the choice of either providing notice as set forth in subd. 2, or submitting to a "court bypass" procedure.[4] Under the court bypass, a judge, after an expedited confidential hearing, may authorize an abortion without parental notice after determining "that the pregnant woman is mature and capable of giving informed consent," or that the performance of an abortion without notification would be in her "best interests." "Parent" is defined in subd. 3 as "both parents of the pregnant woman if they are both living, one parent of the pregnant woman if only one is living or if the second one cannot be located through reasonably diligent effort, or the guardian or conservator if the pregnant woman has one." Subd. 5 is a penalty provision and subjects anyone performing an abortion in violation of the statute to criminal penalties and civil liability. The statute also provides exceptions to the notice requirement[5] as well as a severability provision.[6]
 
 
 3
 The statute was to become effective on August 1, 1981. On July 30, 1981, this action seeking declaratory and injunctive relief was brought by a group including: six class-action minors seeking abortions who claimed to be mature and that notification of one or both of their parents of their desire to have an abortion would not be in their best interests; a mother of one of the minor plaintiffs alleging that notification of the father was not in the minor's best interests; and four clinics and two physicians performing abortions in Minnesota.
 
 
 4
 The district court temporarily restrained enforcement of subd. 2 of the statute (the pure notice provision) on July 31, 1981, but denied injunctive relief as to subd. 6 (the notice/bypass provision).[7] Later, the district court granted partial summary judgment for the defendants by dismissing the plaintiffs' state constitutional claims and by ruling that, on its face, the judicial bypass procedure in subd. 6 did not violate the equal protection and due process rights of pregnant minors. The court concluded, however, that plaintiffs should have the opportunity of a trial to prove their allegations that subd. 6 was being applied unconstitutionally.
 
 
 5
 After a trial lasting five weeks, the district court held that the notification requirement of subd. 2 without judicial bypass was unconstitutional. Hodgson v. Minnesota, 648 F.Supp. 756, 773 (D.Minn.1986), cert. denied, 479 U.S. 1102, 107 S.Ct. 1333, 94 L.Ed.2d 184 (1987). While the court found that the notice/bypass requirement, as a whole, was not supported by factual findings that it furthered in any meaningful way the state's interest in protecting pregnant minors or assuring family integrity, the court concluded that it complied both on its face and in actual practice with standards established by the Supreme Court. Id. at 773-77. The district court then considered in isolation the two-parent notification and the 48-hour waiting period requirement and found both to be unconstitutional. Id. at 777-80. While the 48-hour waiting period requirement was held severable, the two-parent notification requirement was held to be not severable and, accordingly, required that the entire notice-bypass procedure be enjoined in its entirety. Id. at 780-81. Both sides appeal.
 
 I.
 
 6
 The principles governing the constitutionality of the states' regulation of abortion have been set forth by the Supreme Court and bind this court. In Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Supreme Court held that the due process clause of the fourteenth amendment forbids the states from interfering with a pregnant woman's choice, with competent medical advice, to terminate her pregnancy. The right to choose abortion is, however, limited; state regulation is permissible to foster "compelling state interests" by "narrowly drawn" legislation. Id. at 155, 93 S.Ct. at 728. Moreover, in view of the unique status of children under the law, states have a "significant" interest in supporting certain abortion regulations aimed at protecting children that is not present when the state seeks to regulate adults. City of Akron v. Akron Center for Reproductive Health (Akron), 462 U.S. 416, 427 n. 10, 103 S.Ct. 2481, 2491 n. 10, 76 L.Ed.2d 687 (1983) (citing Planned Parenthood v. Danforth, 428 U.S. 52, 74-75, 96 S.Ct. 2831, 2843-44, 49 L.Ed.2d 788 (1976)). Because of "the peculiar vulnerability of children; their inability to make mature decisions in an informed, mature manner; and the importance of the parental role in child rearing," the Court has recognized that states have a significant interest in promoting parental involvement with a minor who is seeking an abortion. See H.L. v. Matheson, 450 U.S. 398, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981) (parental notice); Bellotti v. Baird (Bellotti II), 443 U.S. 622, 633-39, 648, 99 S.Ct. 3035, 3042-46, 3050, 61 L.Ed.2d 797 (1979) (plurality opinion) (parental consent).
 
 
 7
 A majority of the Court, however, has indicated that these state and parental interests must give way to the constitutional right of a mature minor, or of an immature minor whose best interests are contrary to parental involvement, to obtain an abortion without consulting or notifying her parents. Akron, 462 U.S. at 427 n. 10, 103 S.Ct. 2491 n. 10; see e.g., Matheson, 450 U.S. at 414-420, 101 S.Ct. at 1173-1177 (Powell, J., concurring); id. at 450-54, 101 S.Ct. at 1192-95 (Marshall, J., dissenting); Bellotti II, 443 U.S. at 643-44, 99 S.Ct. at 3048-49 (Powell, J.); id. at 653-56, 99 S.Ct. at 3053-55 (Stevens, J., concurring). In view of the unique nature and consequences of the abortion decision, states do not have the constitutional authority "to give a third party an absolute, and possibly arbitrary, veto" over the minor's abortion decision. Bellotti II, 443 U.S. at 643, 99 S.Ct. at 3048 (Powell, J.); id. at 653-56, 99 S.Ct. at 3053-55 (Stevens, J., concurring); Danforth, 428 U.S. at 74-75, 96 S.Ct. at 2843-44. Thus, a state choosing to encourage parental involvement must provide an alternative procedure through which a minor may demonstrate that she is mature enough to make her own decision or that the abortion is in her best interest. Akron, 462 U.S. at 427 n. 10, 103 S.Ct. at 2491 n. 10; see Bellotti II, 443 U.S. at 643-44, 99 S.Ct. at 3048-49 (plurality); Ind. Planned Parenthood v. Pearson, 716 F.2d 1127, 1132 (7th Cir.1983).
 
 
 8
 Justice Powell has described the nature and purpose of the required bypass proceeding:
 
 
 9
 A pregnant minor is entitled in such a proceeding to show either: (1) that she is mature and well enough informed to make her abortion decision, in consultation with her physician, independently of her parents' wishes; or (2) that even if she is not able to make this decision independently, the desired abortion would be in her best interests. The proceeding in which this showing is made must assure that a resolution of the issue, and any appeals that may follow, will be completed with anonymity and sufficient expedition to provide an effective opportunity for an abortion to be obtained. In sum, the procedure must ensure that the provision requiring parental consent does not in fact amount to the "absolute, and possibly arbitrary, veto" that was found impermissible in Danforth.
 
 
 10
 Bellotti II, 443 U.S. at 643-44, 99 S.Ct. at 3048-49 (footnote and citation omitted). The judicial bypass procedure outlined by Justice Powell in Bellotti II was subsequently endorsed by a majority of the Court in Planned Parenthood v. Ashcroft, 462 U.S. 476, 490-93, 103 S.Ct. 2517, 2524-26, 76 L.Ed.2d 733 (1983), id. (upholding consent/bypass statute) and Akron, 462 U.S. at 438-40, 103 S.Ct. at 2496-98.
 
 A.
 
 11
 Based on these principles, the district court held subd. 2, the notification provision without judicial bypass, unconstitutional. The court concluded that Minnesota may not require a minor to notify her parents of her intent to have an abortion without providing an alternative court procedure. Hodgson, 648 F.Supp. at 773.
 
 
 12
 Although Bellotti II considered the constitutionality of a parental consent rather than parental notice statute, the plurality opinion indicated that a state is required to make the alternative bypass procedure available under both types of statutes. Id. 443 at 647, 99 S.Ct. at 3050. See Akron, 462 U.S. at 441 n. 31, 103 S.Ct. at 2498 n. 31; Matheson, 450 U.S. at 420 and n. 9, 101 S.Ct. at 1177 and n. 9 (Powell, J., concurring) (stating that the rationale for requiring a state to provide a judicial bypass to a consent requirement is applicable to notification statutes); id. at 428 n. 3, 101 S.Ct. at 1181 n. 3 (Marshall, J., dissenting); see also Zbaraz v. Hartigan, 763 F.2d 1532, 1539 (7th Cir.1985), aff'd without op., --- U.S. ----, 108 S.Ct. 479, 98 L.Ed.2d 478 (1987); Pearson, 716 F.2d at 1132. Cf. Matheson, 450 U.S. at 409, 101 S.Ct. at 1171 (Constitution is not violated by statute requiring notice to the parents of an immature dependent minor seeking an abortion).[8] The state argues in its brief that the notification requirement without the judicial bypass option is constitutional, but did not press this position at oral argument. We conclude that the district court did not err in ruling that a bypass procedure is constitutionally required by the several Supreme Court decisions cited above as an alternative to parental notification.
 
 B.
 
 13
 The district court then examined the constitutionality of the notice/bypass provision. The court made a variety of factual findings with respect to the operation of the court bypass procedure over the past five years. It outlined in detail the availability of abortion services in Minnesota, underscoring the fact that virtually all of Minnesota's abortion providers are located in the two major metropolitan areas of the state: Duluth and Minneapolis-St. Paul. Many women had to travel long distances to obtain an abortion and the court recognized transportation problems facing women seeking an abortion, particularly during the winter. Women from outside the metropolitan areas tended to have abortions later in their pregnancy than women from other parts of the United States. Hodgson, 648 F.Supp. at 761.
 
 
 14
 The court also found that the experience of going to court for judicial authorization subjected the minors to a great deal of stress and that some considered the court proceedings more difficult than the abortion itself. The court found that the two-parent notice requirement affected many minors living in single-parent homes who had notified the custodial parent and minors living in two-parent homes who voluntarily consulted with one parent. These minors either had to notify the second parent or go through the court bypass procedure. The court found that either option was emotionally traumatic and interfered with the communication voluntarily initiated by the minor. The court noted that these instances were not uncommon and were supported by the fact that approximately 20-25% of minors who went to court were accompanied by, or indicated that they had consulted with, one parent. Id. at 763-64.
 
 
 15
 Many of the judges who heard bypass petitions testified that they felt the procedure was traumatic for the minors and did little good. Dr. Hodgson, one of the plaintiffs, testified that there was no benefit whatsoever to the law and that the law had created "nothing but problems" for her teenage patients. There was testimony that the law did not enhance parent-child communication or improve family relations. Id. at 766-68.
 
 
 16
 Against these considerations, the court assessed the strength of the state's interests and the extent to which the statute furthered these interests. The court found that the statutory goal is to foster intra-family communication and to protect the well-being of pregnant minors by encouraging them to discuss with their parents the decision whether to have an abortion. The statute was designed to enable parents to provide support and guidance and prevent their daughters from making irrational and emotional decisions. Parents might also be able to provide medical history of which the minor may be unaware, help with post-abortion care, and support the child psychologically. The court found that the legislature also wanted to deter and dissuade minors from choosing abortion. Id. at 765-66.
 
 
 17
 The court found the two-parent notice requirement placed a substantial burden of obtaining a judicial waiver upon a group of minors composed almost entirely of either mature minors or minors whose best interests were not served by notification. It ultimately concluded that this burden was not justified by the state's interest in encouraging intra-family communication and protecting immature minors because the statute did not further either of these interests in any meaningful way.[9] The court rejected the possibility that the statute's existence encouraged immature, non-best interest pregnant minors to notify their parents and that this intangible effect was not amenable to proof at trial. Id. at 775-76.
 
 
 18
 Despite these factual findings, the district court concluded that Bellotti II required its holding that the notice/bypass procedure as a whole was constitutional. The court recognized that it was "not writing on a clean slate" in determining the constitutionality of Minnesota's parental notification statute and that the Supreme Court has limited its inquiry to an issue of statutory construction: specifically, whether Minnesota provides a judicial alternative to notification that is consistent with established legal standards. Hodgson, 648 F.Supp. at 776-77 (citing Ashcroft, 462 U.S. at 491-92, 103 S.Ct. at 2525-26). The court found that the "maturity" and "best interest" standards articulated in the Minnesota statute complied with those in Bellotti II and that the Minnesota courts have applied these standards in hearing bypass petitions. Id. at 777.
 
 
 19
 The court then determined that the judicial bypass procedure, in actual operation, was being applied constitutionally. The court found that judges had almost never denied a minor's petition to proceed with the abortion without notifying her parents; there were only nine instances.[10] It found that the Minnesota courts have established procedures to assure the minor's anonymity and to expedite both the initial hearing and any subsequent appeal. The delays, although burdensome to minor petitioners, did not reflect a "systemic failure to provide a judicial bypass option in the most expeditious, practical manner." Id. The court concluded that the judicial bypass procedure, as presently executed by the Minnesota courts and other offices that participate in the bypass proceedings, complied with the legal standards set forth in Bellotti II and approved in Ashcroft. Therefore the court rejected the plaintiffs' challenge to Minnesota's notice/bypass requirement as a whole. Id.
 
 
 20
 The Hodgson group (the class-action minors, physicians, clinics and parent) argues that the district court erred in limiting its inquiry to an issue of pure statutory construction, because no court has considered the actual effect of a consent/bypass or notice/bypass statute in operation. They argue that the state failed to meet its burden of proving that the statute in actual operation serves significant state interests without unduly burdening minors' constitutional rights. They attack the assumptions implicit in Bellotti II and Ashcroft that a notice or consent requirement imposed in conjunction with an appropriate alternative bypass procedure serves significant state interests without unduly burdening the right of a mature or best interest minor to obtain an abortion. The state, on the other hand, urges that its authority to require parental notification with a court bypass has been established as a matter of law.[11]
 
 
 21
 We recognize that a statute may be facially valid, yet upon full development of a factual record be considered unconstitutional in operation.[12] We are satisfied, however, that the Supreme Court has considered the issues factually before the district court,[13] and that approval given to similar statutory plans mandates approval in this case. See Ashcroft, 462 U.S. at 490-93, 103 S.Ct. at 2524-26; Matheson, 450 U.S. at 409, 101 S.Ct. at 1171.
 
 
 22
 To be sure, the district court's detailed factual findings concerning the general difficulties of obtaining an abortion in Minnesota and the trauma of the bypass procedure, compared to its effectiveness, raise considerable questions about the practical wisdom of this statute. Nevertheless, we believe these are questions for the legislature. The minor's pregnancy itself is traumatic and if she considers abortion, complex issues arise involving numerous competing interests. These interests have been fully recognized by the Supreme Court. A minor's decision to obtain an abortion may not be unconstitutionally burdened, Matheson, 450 U.S. at 418-19, 101 S.Ct. at 1175-76 (citations omitted), but "the peculiar vulnerability of children; their inability to make mature decisions in an informed, mature manner; and the importance of the parental role in child-rearing," Bellotti II, 443 U.S. at 634, 99 S.Ct. at 3043 (plurality), provides the states with a strong interest in promoting parental involvement. Akron, 462 U.S. at 427 n. 10, 103 S.Ct. at 2491 n. 10. The Supreme Court has considered these competing interests and recognized as a matter of law that parental notice or consent requirements do not unconstitutionally burden a minor's abortion right when an appropriate judicial bypass is in place. See Ashcroft, 462 U.S. at 490-94, 103 S.Ct. at 2524-27 (challenge to the constitutionality of Missouri's consent/bypass statute treated purely as an issue of statutory construction). See also Akron, 462 U.S. at 438-40, 103 S.Ct. at 2496-97 (same); Zbaraz, 763 F.2d at 1539-45 (same); Pearson, 716 F.2d at 1133 (same). We therefore reject the Hodgson group's arguments to the contrary.
 
 
 23
 Careful study of Bellotti II, Ashcroft, and Matheson reveal the significant state interests which justify Minnesota's notice/bypass statute. Notwithstanding the district court's factual findings, it recognized that the Supreme Court has assumed and recognized certain interests as a matter of law. In Bellotti II, a plurality of the Court identified the significant state and parental interests at stake when a minor faces the decision of whether to have an abortion. The special importance and consequences of the abortion decision for the minor are recognized as a sufficient justification for reasonable state efforts to ensure that the decision be wisely made:
 
 
 24
 "[Plaintiffs] suggest ... that the mere requirement of parental notice [unduly burdens the right to seek an abortion]. * * * [H]owever, parental notice and consent are qualifications that typically may be imposed by the State on a minor's right to make important decisions. As immature minors often lack the ability to make fully informed choices that take account of both immediate and long-range consequences, a State reasonably may determine that parental consultation often is desirable and in the best interest of the minor. It may further determine, as a general proposition, that such consultation is particularly desirable with respect to the abortion decision--one that for some people raises profound moral and religious concerns....
 
 
 25
 "There can be little doubt that the State furthers a constitutionally permissible end by encouraging an unmarried pregnant minor to seek the help and advice of her parents in making the very important decision whether or not to bear a child. That is a grave decision, and a girl of tender years, under emotional stress, may be ill-equipped to make it without mature advice and emotional support. It seems unlikely that she will obtain adequate counsel and support from the attending physician at an abortion clinic, where abortions for pregnant minors frequently take place."
 
 
 26
 Bellotti II, 443 U.S. at 640-41, 99 S.Ct. at 3046-47 (plurality) (footnotes omitted) (quoting Danforth, 428 U.S. at 91, 96 S.Ct. at 2851 (concurring opinion)). See also Bellotti II, 443 U.S. at 657, 99 S.Ct. at 3055 (dissenting opinion); Matheson, 450 U.S. at 409-10, 101 S.Ct. at 1171-72; id., at 422-23, 101 S.Ct. at 1177-78 (concurring opinion).
 
 
 27
 In addition, the state has an interest in the family itself, the institution in which "we inculcate and pass down many of our most cherished values, moral and cultural." Matheson, 450 U.S. at 419, 101 S.Ct. at 1176 (concurring opinion) (quoting Moore v. East Cleveland, 431 U.S. 494, 503-04, 97 S.Ct. 1932, 1937-38, 52 L.Ed.2d 531 (1977)). Parents have a traditional and substantial interest in, as well as a responsibility for, the rearing and welfare of their children. In Matheson, the Court stated:
 
 
 28
 [C]onstitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society:
 
 
 29
 We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected. "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder"
 
 
 30
 We have recognized that parents have an important "guiding role" to play in the upbringing of their children, which presumptively includes counseling them on important decisions.
 
 
 31
 450 U.S. at 410, 101 S.Ct. at 1171 (citations omitted).[14]
 
 
 32
 Finally, the Supreme Court has recognized the significant state interest in providing an opportunity for parents to supply essential medical and other information to a physician:
 
 
 33
 The medical, emotional, and psychological consequences of an abortion are serious and can be lasting; this is particularly so when the patient is immature. An adequate medical and psychological case history is important to the physician. Parents can provide medical and psychological data, refer the physician to other sources of medical history such as family physicians, and authorize family physicians to give relevant data.
 
 
 34
 Matheson, 450 U.S. at 411, 101 S.Ct. at 1172.
 
 
 35
 Because of these interests, a plurality of the Court in Bellotti II concluded that a parental consent statute, when an alternative bypass mechanism is in place, does not unconstitutionally burden a minor's abortion right. Bellotti II, 443 U.S. at 649, 99 S.Ct. at 3051. See also Ashcroft, 462 U.S. at 490-93, 103 S.Ct. at 2524-26; and Matheson, 450 U.S. at 411-14, 101 S.Ct. at 1172-74; id. at 418-20, 423-25, 101 S.Ct. at 1175-77, 1178-79 (Powell, J. concurring) (dealing with a notice requirement). Certainly, the evidence demonstrates that these interests and principles apply differently in individual child-parent relationships. The child living in a no-parent or one-parent household may face different considerations than a child living in a two-parent home, as do the mature minor and the immature minor. But to allow specific factual findings with reference to the mature minor or the minor from no- and one-parent households to invalidate the notice/bypass procedure would defeat the recognized parental interests, particularly with respect to the immature and vulnerable child. See Matheson, 450 U.S. at 420, 101 S.Ct. at 1177 (Powell, J., concurring) ("The circumstances relevant to the abortion decision by a minor can and do vary so substantially that absolute rules--requiring parental notice in all cases or in none--would create an inflexibility that often would allow for no consideration of the rights and interests [we have] identified"). If there is to be any regulation, and the Supreme Court has clearly upheld regulation with respect to two-parent families and immature minors, it must apply to all. The Minnesota statute does not require parental notice in all cases. Cf. Danforth, 428 U.S. at 74-75, 96 S.Ct. at 2843-44. The statute provides exceptions for emancipated minors, minors who are the victims of abuse, and for abortions necessary in an emergency. Most importantly, the statute provides for judicial bypass of the notification requirement for all minors if the minor is mature enough to make the abortion decision independently or if notification would not be in her best interests.[15] See Bellotti II, 443 U.S. at 643-44, 99 S.Ct. at 3048-49 (plurality); Ashcroft, 462 U.S. at 490-93, 103 S.Ct. at 2524-26. The bypass procedure provides an effective and independent method for analyzing the situation of the individual pregnant minor--her maturity or immaturity; her no-parent, two-parent or one-parent background; and for determining if it is in her best interests that both parents not be notified. We conclude that the statute complies with the standards set forth in Bellotti II and that the Supreme Court's approval of similar plans mandates approval here. Ashcroft, 462 U.S. at 490-93, 103 S.Ct. at 2524-26; Matheson, 450 U.S. at 413, 101 S.Ct. at 1173. The district court did not err in concluding that the statute, as a whole, is constitutional.
 
 C.
 
 36
 After confirming the constitutionality of the statute as a whole, the court considered in isolation Minnesota's two-parent notice requirement. The court discussed the high incidence of divorce and the effect this often has on family communication. According to the court, approximately 50% of all marriages in Minnesota end in divorce, and approximately 42% of all minors in Minnesota do not live with both biological parents. Further, the court found that many minors in Minnesota "live in fear of violence by family members," and that the incidence of family violence is dramatically underreported. The court found that parental notification can only add to the magnitude of the problem of family violence which, in turn, intensifies the distress and anxiety of the minor's abortion decision. The court noted that divorce and separation usually impair family communication, with the non-custodial parent often having little communication with the child. The court also stated that the effect of compelling a minor in this situation to share information about her pregnancy and abortion decision with both parents can be harmful, particularly when the minor comes from an abusive, dysfunctional family. The court found that 20-25% of minors who went to court notified one parent voluntarily and that minors who ordinarily would notify one parent might be dissuaded from doing so by the two-parent requirement. Hodgson, 648 F.Supp. 768-69.
 
 
 37
 Based on these findings, the court concluded that "the need to notify the second parent or to make a burdensome court appearance actively interferes with the parent-child communication voluntarily initiated by the child, communication assertedly at the heart of the state's purpose in requiring notification of both parents. In these cases, requiring notification of both parents affirmatively discourages parent-child communication." Id. at 777-78. Thus, the court concluded that the two-parent notice requirement failed to further the state's interests in protecting pregnant minors and promoting family communication and was therefore invalid. Id. at 778 (citing Carey v. Population Services Int'l, 431 U.S. 678, 693, 97 S.Ct. 2010, 2020, 52 L.Ed.2d 675 (1977); Danforth, 428 U.S. at 75, 96 S.Ct. at 2844). The court rejected the argument that the two-parent notice requirement could be severed. Hodgson, 648 F.Supp. at 780.
 
 
 38
 The Hodgson group argues that the district court's findings of fact are not clearly erroneous and that under Anderson v. Bessemer City, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), affirmance of the district court is mandated. The state in response does not attack the findings of the district court, but argues with some force that once the district court determined that the procedure as a whole was constitutional as a matter of statutory interpretation, its inquiry should have ended. We confess some confusion as to why the district court examined the two-parent notice and the 48-hour delay requirements in isolation and applied its conclusions to invalidate the entire statutory procedure it had just approved. Possibly it felt required to do so by the limitation of the holdings in Bellotti II, 443 U.S. at 649, 99 S.Ct. at 3051 (plurality) (minors living at home with both parents), and Matheson, 450 U.S. at 411, 101 S.Ct. at 1172 (immature and dependent minors). Certainly, the Supreme Court limited its holdings to such minors. Nevertheless, the limitations of the holdings do not prevent the application of the principles announced by the Supreme Court to both the no-parent and one-parent households as well as the mature minor. We are satisfied that the issue here then is not the district court's factual findings, but its failure to take full account of these recognized principles.
 
 
 39
 In particular, as applied to all pregnant minors, regardless of their family circumstances, the district court did not consider whether parental and family interests (as distinguished from the interests of the minor alone) justified the two-parent notice requirement. As discussed in Part B, supra, the Supreme Court has recognized the significant interests of parents in the rearing and welfare of their children and that these interests justify parental involvement in the minor's abortion decision. The Supreme Court has never indicated that these interests are contingent upon the parent having custody of the child.
 
 
 40
 The district court's conclusion that the two-parent notice requirement failed to further the state's interests was based primarily on its factual findings regarding the burden imposed on minors in family units that have either "broken apart or never formed."[16] Hodgson, 648 F.Supp. at 778. The statutory plan before us demonstrates the difficulty of designing an overall plan which must apply to all pregnant minors regardless of their family circumstances. Certainly, the application of such a general statute will result in greater burdens for some individuals. Indeed, this is the very reason the Supreme Court has concluded that a judicial bypass is imperative; the alternative bypass procedure would be unnecessary unless some burden resulted from the generality of the statute. Any added burden the two-parent notification requirement imposes in individual cases is negated by the judicial bypass mechanism, which enables a mature or "best interests" minor to go directly to court without consulting or notifying both parents. See Bellotti II, 443 U.S. at 649, 99 S.Ct. at 3051 (plurality); Matheson, 450 U.S. at 420, 101 S.Ct. at 1177 (Powell, J., concurring). Similarly, the statute may not be invalidated because it does not correspond perfectly in all cases to the state's asserted interests. See Akron, 462 U.S. at 438, 103 S.Ct. at 2496-97.
 
 
 41
 In Bellotti II, a plurality of the Court indicated that the requirement of obtaining both parents' consent, when an alternative judicial bypass is in place, does not unconstitutionally burden a minor's abortion right:
 
 
 42
 We are not persuaded that, as a general rule, the requirement of obtaining both parents' consent unconstitutionally burdens a minor's right to seek an abortion. The abortion decision has implications far broader than those associated with most other kinds of medical treatment. At least when the parents are together and the pregnant minor is living at home, both the father and mother have an interest--one normally supportive--in helping to determine the course that is in the best interests of a daughter. Consent and involvement by parents in important decisions by minors long have been recognized as protective of their immaturity. In the case of the abortion decision, for reasons we have stated, the focus of the parents' inquiry should be the best interests of their daughter. As every pregnant minor is entitled in the first instance to go directly to the court for a judicial determination without prior parental notice, consultation, or consent, the general rule with respect to parental consent does not unduly burden the constitutional right. Moreover, where the pregnant minor goes to her parents and consent is denied, she still must have recourse to a prompt judicial determination of her maturity or best interests.
 
 
 43
 443 U.S. at 649, 99 S.Ct. at 3051.
 
 
 44
 Moreover, unlike the statute in Bellotti II which required the consent of both parents, the Minnesota statute requires only notification. Although we recognize that a notice requirement without judicial bypass would be unduly burdensome, at least as applied to mature minors, cf. Matheson, 450 U.S. at 409, 101 S.Ct. at 1171 (two parent notice requirement constitutional as applied to immature, dependent minors), we are satisfied that a notification requirement is substantially less burdensome than a consent requirement. Consent requires not only notification but also the affirmative agreement of one or both parents to the abortion. This can be expected to cause considerably more conflict, delay and ill effects than notification alone.
 
 
 45
 Although some parents may be abusive, or at best unhelpful to their minor child faced with the decision whether to have an abortion, that is hardly a reason to discard the pages of experience teaching that parents generally do act in their child's best interests.[17] Parham v. JR, 442 U.S. 584, 602-03, 99 S.Ct. 2493, 2504-05, 61 L.Ed.2d 101 (1979). While the district court found that the non-custodial parent often has little communication with the child, this does not mandate completely casting aside the principles enunciated by the Supreme Court as to the parental role, which apply to non-custodial parents as well as custodial parents. By providing for judicial bypass, the statute safeguards those minors for whom parental involvement may not be in their best interests, while at the same time encouraging parental involvement for those minors who may be greatly assisted at a difficult time. We cannot conclude the two-parent notice requirement imposed in conjunction with a bypass option unduly burdens the right of a mature or best interests minor to obtain an abortion. See Bellotti II, 443 U.S. at 649, 99 S.Ct. at 3051 (plurality); Matheson, 450 U.S. at 420, 101 S.Ct. at 1176-77 (Powell, J., concurring).
 
 
 46
 The district court enjoined the entire statute because of the impact of the two-parent notice requirement primarily upon one group of pregnant minors, without considering the effect of the bypass, or the parental and family interests which have been recognized by the Supreme Court. In concentrating upon the impact of the statute on the pregnant minor not living with both parents, and on the mature or non best-interest pregnant minor, the district court gave only limited consideration to the 50% or more pregnant minors who live with both parents and to pregnant minors who are immature and whose best interests may require parental involvement. The district court's determination that an undue burden on the one group renders the statute unconstitutional for all is contrary to the Supreme Court's decision that a notice-consent/bypass procedure plainly serves important state interests and is narrowly drawn to protect only those interests. It does not violate any guarantees of the Constitution. Matheson, 450 U.S. at 413, 101 S.Ct. at 1173. We are convinced that the statute must be considered, as the Supreme Court has considered the statutes in its numerous decisions and as the district court originally did, as a whole: the two-parent notification, the 48-hour waiting period, and judicial bypass. Considering the statute as a whole and as applied to all pregnant minors, the two-parent notice requirement does not unconstitutionally burden the minor's abortion right. Matheson, 450 U.S. at 413, 101 S.Ct. at 1173. The statute complies with the constitutional requirements set forth in Bellotti II, and approved in Ashcroft and Matheson. We conclude that the court erred in enjoining the statute because of its isolated consideration of the two-parent notice requirement.
 
 D.
 
 47
 Similar considerations apply to the district court's treatment of the 48-hour delay requirement. The court found that minors who notified their parents in writing must wait 48 hours after actual or constructive delivery of the notice. Constructive delivery of mail notice occurs at noon on the next day upon which regular mail delivery takes place. Thus, minors who notified their parents in writing commonly waited 72 hours between initiating the notification process and the abortion itself. The court found that this delay was compounded by the weather, scheduling factors, and transportation requirements and that in many cases the delay reached a week or more. Delay of any length in performing an abortion increased the statistical risk of mortality. Hodgson, 648 F.Supp. at 764-65.
 
 
 48
 In considering the plan as a whole, the court acknowledged that some period of delay from the time of notice until the abortion would "reasonably effectuate the state's interests in protecting pregnant minors" and that a "waiting period may allow parents to aid, counsel, and advise * * * minors in determining whether to undergo an abortion or to provide the physician with information which may be relevant to the medical judgments involved." The court concluded, however, that the interest could be effectuated as completely by a shorter waiting period. Id. at 769. The court held that the 48-hour waiting period was severable from the remainder of the statute. Id. at 780.
 
 
 49
 Considering the statute as a whole, the 48-hour delay requirement is not a significant burden upon the minor's abortion right. The district court's finding regarding possible delays of a week or more is based upon facts relating to the relative inaccessibility of abortion providers in Minnesota, not the 48-hour delay requirement. The court failed to recognize that the 48-hour delay requirement may run concurrently with the scheduling of the appointment to perform the abortion. Testimony at trial revealed that typically, when a pregnant minor telephones an abortion clinic to schedule an abortion, the abortion is not scheduled for two to three days.[18] More importantly, mandatory delay results only when the minor complies with the statute by providing written notice to her parents; the bypass option imposes no mandatory delay. Cf. Planned Parenthood Ass'n of Kansas City v. Ashcroft, 483 F.Supp. 679, 694-96 (W.D.Mo.1980) (physician must provide woman information specified in statute 48 hours before she may consent to the abortion). We cannot conclude that the delay requirement as a part of the overall statutory scheme is a significant burden in light of Minnesota's interest in ensuring that notification results in parental involvement.[19] See Matheson, 450 U.S. at 446, 101 S.Ct. at 1190 (Marshall, J., dissenting).II.
 
 
 50
 The Hodgson group contends that the district court erred in holding that the statute does not violate the equal protection clause. First, they argue that the statute deprives minors who choose abortion of equal protection of the law because it singles out abortion as the only pregnancy-related medical procedure requiring third-party notification and because the statute impermissibly discriminates between those minors who are able to notify both their parents and those who cannot. The Hodgson group failed to raise the latter challenge at trial, and therefore we need not address it here. Stafford v. Ford Motor Co., 790 F.2d 702, 706 (8th Cir.1986). As to the first issue, a similar challenge was rejected by the Court in Matheson, 450 U.S. at 412-13, 101 S.Ct. at 1172-73, and the Court has rejected challenges to abortion statutes based on different treatment in other contexts. Harris v. McRae, 448 U.S. 297, 325, 100 S.Ct. 2671, 2692, 65 L.Ed.2d 784 (1980) (abortion funding); Maher v. Roe, 432 U.S. 464, 469-71, 97 S.Ct. 2376, 2380-81, 53 L.Ed.2d 484 (1977) (abortion funding); Danforth, 428 U.S. at 66-67, 96 S.Ct. at 2839-40 (written consent to abortion). Moreover, as discussed in Part I, supra, a state may regulate a minor's exercise of her constitutional rights in a manner that would not be permissible in the case of an adult. Akron, 462 U.S. at 427 n. 10, 103 S.Ct. at 2491 n. 10. Based on the interests discussed, states may rationally conclude that the decision to have an abortion poses risks to the physical, mental or emotional well-being of minors which are greater than those associated with other health care services. Bellotti II, 443 U.S. at 640-41, 648-49, 99 S.Ct. at 3046-47, 3050-51 (plurality). "If the pregnant girl elects to carry her child to term, the medical decisions to be made entail few--perhaps none--of the potentially grave emotional and psychological consequences of the decision to abort." Matheson, 450 U.S. at 412-13, 101 S.Ct. at 1172-73. Thus, we cannot say the district court erred in concluding the statute does not violate the equal protection clause.
 
 
 51
 We conclude that the Minnesota statutory plan, including judicial bypass, is constitutional and complies with the principles announced in Bellotti II, Ashcroft and Matheson. Accordingly, we reverse the judgment of the district court and remand with instructions that the district court enter judgment that Minn.Stat.Ann. Sec. 144.343(2)-(7) is constitutional.
 
 
 52
 LAY, Chief Judge, with whom McMILLIAN, Circuit Judge, joins, dissenting.
 
 
 53
 I respectfully dissent.[1] I would adhere to the well-reasoned panel opinion written by Judge Rosenn.*
 
 
 54
 The majority's analysis is seriously flawed in several respects:
 
 
 55
 (1) it fails to focus on the issue involved, which is whether a two-parent notification statute with a judicial bypass provision is constitutional;
 
 
 56
 (2) it completely ignores the evidence amassed in a five-week trial and the district court's findings of fact as irrelevant to the constitutional issue;
 
 
 57
 (3) without legal support, it relies upon the judicial bypass provision to uphold an unconstitutional two-parent notification requirement;
 
 
 58
 (4) it has created a new right, apparently of constitutional dimension, for non-custodial parents to receive notice of their minor children's activities; and
 
 
 59
 (5) its upholding of the 48-hour waiting period is contrary to nearly every other court decision on this issue.
 
 
 60
 It is important to recognize the limited issue before this court: may a state constitutionally enact a statute that requires a minor to notify both parents before she may obtain an abortion, even though one parent may have deserted her or has no custodial rights over her. The majority spends most of its discussion reciting the reasoning of cases in which the Supreme Court examined the facial constitutionality of various parental consent or notification statutes.[2] Its discussion, however, avoids the fundamental issue of this case, which is the effects of the application in Minnesota of the two-parent notice rule. Minnesota is the only state in the union that requires two-parent notification without exception for divorce, separation, or other comparable situations. A statute of this type has never been reviewed by the Supreme Court.
 
 
 61
 Our duty therefore should be to examine the two-parent notification requirement to determine whether the statute "plainly serves important state interests [and] is narrowly drawn to protect only those interests * * *." H.L. v. Matheson, 450 U.S. 398, 413, 101 S.Ct. 1164, 1173, 67 L.Ed.2d 388 (1981). The state bears the burden to show that the statute is tailored to achieve a significant state policy. The district court found as a matter of fact that the statute not only fails to serve the state's asserted interests, but that it actually undermines those interests. Hodgson v. Minnesota, 648 F.Supp. 756, 768 (D.Minn.1986).
 
 
 62
 The majority simply ignores the district court's factual findings. I respectfully submit that in doing so it abdicates its judicial responsibility. Judge Gibson, writing for the majority, states: "[T]he district court's detailed factual findings * * * raise considerable questions about the practical wisdom of this statute. Nevertheless, we believe these are questions for the legislature." At 1459. Thus, and because it never directly states that the district court's factual findings are clearly erroneous, the majority rejects the established principle that states must demonstrate that their infringements of constitutional rights are closely related to achieving important interests. Nowhere does the majority point to evidence offered by the state to show the relationship between the ends sought and the means utilized. Instead, the majority apparently relies on two factors to support its cavalier treatment of the district court's factual findings.
 
 
 63
 The first factor relied upon is "the pages of experience teaching that parents generally do act in their child's best interests." At 1464. The second basis for the majority's action is its misplaced theory that the Supreme Court has decided as a matter of law "that a notice-consent/bypass procedure plainly serves important state interests and is narrowly drawn to protect only those interests." At 1464. Neither of these assertions can justify the result today.
 
 
 64
 Our societal presumption that parents generally act in their children's best interests is not at issue here. The relevant question is whether requiring two-parent notification without exception for cases of divorce, separation, desertion, or other comparable familial situations imposes undue burdens on the minor's exercise of her constitutional rights. Plaintiffs introduced largely unrebutted factual evidence that persuaded the district court that the requirement is unduly burdensome. We cannot ignore this evidence based on an irrelevant societal presumption. Cf. Bikel, Judicial Determination of Questions of Fact Affecting the Constitutional Validity of Legislative Action, 38 Harv.L.Rev. 6, 6 (1924):
 
 
 65
 [N]o court can undertake to decide upon the validity of legislation * * * [without] first be[ing] informed as to the truth of some question of fact which the statute postulates or with reference to which it is to be applied; and the validity of the legislation depends on the conclusions reached by the court with reference to this question of fact.
 
 
 66
 Similarly, the majority's theory that the Supreme Court has held that all notice/bypass procedures are constitutional as a matter of law is insupportable. The Court has never examined the validity of a statute like Minnesota's; the statute is unparalleled in this country. Furthermore, the Court has never examined a notification requirement in operation, because all of the cases in which it examined such statutes involved facial challenges. It is impossible for the Court to have declared as a matter of law that all notice/bypass procedures are "narrowly drawn to protect only [important state] interests" when the statutory provisions can contain as many variations as there are statutes.
 
 
 67
 The majority reasons that although the two-parent notification requirement imposes a burden on the minor, this burden is negated by the judicial bypass provision. This analysis is egregiously wrong. The mere presence of an alternative bypass procedure cannot salvage the two-parent notification requirement.
 
 
 68
 The majority's analysis fails to recognize that a judicial bypass procedure has been required not for the purpose of making an unconstitutional notice provision constitutional, but because even a valid notice requirement may be imposed only on minors who are immature or whose best interests would not be served by making the abortion decision without parental involvement. See City of Akron v. Akron Center for Reproductive Health, Inc., 462 U.S. 416, 427-28 n. 10, 103 S.Ct. 2481, 2490-92 n. 10, 76 L.Ed.2d 687 (1983); Bellotti v. Baird, 443 U.S. 622, 647-48, 99 S.Ct. 3035, 3050-51, 61 L.Ed.2d 797 (1979) (plurality) (Bellotti II ). There is an entire class--immature, non-best interests minors--that can never use the judicial bypass procedure. The court therefore must examine the notification requirement in isolation because as to these minors there is absolutely no alternative to parental notification, even with the statutory provision of a bypass procedure.
 
 
 69
 The second reason the bypass provision does not purge the statute of its unconstitutionality has to do with the combined effect of requiring either two-parent notification or submission to a judicial procedure. As the district court found:
 
 
 70
 Twenty to twenty-five percent of the minors who go to court either are accompanied by one parent who knows and consents to the abortion or have already told one parent of their intent to terminate their pregnancy. The vast majority of these voluntarily informed parents are women who are divorced or separated from spouses whom they have not seen in years. Going to court to avoid notifying the other parent burdens the privacy of both the minor and the accompanying parent. The custodial parents are angry that their consent is not sufficient and fear that notification will bring the absent parent back into the family in an intrusive and abusive way.
 
 
 71
 Minors who ordinarily would notify one parent may be dissuaded from doing so by the two-parent requirement. A minor who must go to court for authorization in any event may elect not to tell either parent. In these instances, the requirement that minors notify both biological parents actually reduces parent-child communication.
 
 
 72
 648 F.Supp. at 769. Thus, a two-parent notification requirement, combined with the alternative bypass provision, actually reduces parent-child communications. The combination also completely negates the interest of certain minors--those twenty to twenty-five percent who go to court accompanied by a parent--in avoiding disclosure of personal matters. See Whalen v. Roe, 429 U.S. 589, 599, 97 S.Ct. 869, 876, 51 L.Ed.2d 64 (1977) (right of privacy protects interest in avoiding disclosure of personal matters as well as interest in independent decisionmaking). These minors voluntarily inform one parent of their intent to obtain an abortion; the district court found that these parents generally are divorced or separated. Yet these minors must still go through the burdensome court procedure and the public disclosure of intensely personal facts that the procedure entails.[3] Coercing public disclosure when one divorced or separated parent has already been informed of the minor's decision cannot serve any significant state interest; if it does, the state did not offer any persuasive proof of that fact.
 
 
 73
 Finally, if courts do not separately examine the notification portions of these statutes, states could formulate irrational and burdensome requirements, all in the guise of protecting "family integrity." Suppose, for instance, that in addition to requiring parental notification, a state required notice to all living grandparents. Based on the majority's reasoning, this requirement, although perhaps burdensome to some minors, would be constitutional as long as combined with an alternative expeditious and confidential bypass procedure. Yet at some point a state's notification requirements could become so burdensome as to force all minors to go to court. As the state conceded at oral argument, however, a bypass provision could not pass constitutional scrutiny by itself. Moreover, the majority acknowledges that "[t]he circumstances relevant to the abortion decision by a minor can and do vary so substantially that absolute rules * * * would create an inflexibility that often would allow for no consideration of the rights and interests [we have] identified." Matheson, 450 U.S. at 420, 101 S.Ct. at 1177 (Powell, J., concurring), quoted at 1461. To avoid these types of absolute rules, states must provide alternatives for the minor, none of which can be so burdensome as to amount to a denial of constitutional rights. If one "alternative" is unconstitutional, minors effectively are governed by absolute rules. Courts therefore must examine each of the alternatives the states devise. The majority's failure to recognize or accept this principle is inexplicable.
 
 
 74
 An equally inexplicable thread running through the court's opinion is its solicitous concern for the rights of non-custodial parents.[4] The court's emphasis on the interest of non-custodial parents in being informed of their minor children's activities elevates that interest so as to outweigh the recognized constitutional rights of minors. It does so based on a misunderstanding of the reasons the Supreme Court has approved of parental notification laws and of the nature of child custody laws.
 
 
 75
 The Supreme Court has never declared that parents (much less non-custodial parents) have an absolute, independent right to be informed when their minor children seek to have an abortion. Rather, the Court has approved of such requirements primarily as a means of furthering the state's interest in protecting the minor by assuring that she makes a well-informed decision. See, e.g., City of Akron, 462 U.S. at 439, 103 S.Ct. at 2497 ("In [Bellotti II,] a majority of the Court indicated that a State's interest in protecting immature minors will sustain a requirement of a consent substitute, either parental or judicial.") (emphasis added); Matheson, 450 U.S. at 412, 101 S.Ct. at 1172 ("The [parental notification] statute is reasonably calculated to protect minors * * * by enhancing the potential for parental consultation concerning a decision that has potentially traumatic and permanent consequences.") (emphasis added); id. at 419, 101 S.Ct. at 1176 ("The State * * * has an interest in fostering such consultation as will assist the minor in making her decision as wisely as possible.") (Powell, J., concurring); Bellotti II, 443 U.S. at 638, 99 S.Ct. at 3045 ("Legal restrictions on minors, especially those supportive of the parental role, may be important to the child's chances for the full growth and maturity that make eventual participation in a free society meaningful and rewarding.") (plurality) (emphasis added; footnote omitted).[5]
 
 
 76
 There is more than a little irony in the majority's assumption that the state promotes "family integrity" by forcing minor children to locate and inform non-custodial parents of this decision. Approximately 42% of all minors in Minnesota do not live with both biological parents. Hodgson, 648 F.Supp. at 768. For all of these minors, the "family" does not consist of the traditionally accepted unit, because of voluntary relinquishment of parental control, legal separation of parent and child, or other reasons. Yet the state of Minnesota declares that in this one instance only (a suspect indication in itself) the "family" must conform to state-mandated principles of what a family should be like.[6] Far from promoting the integrity and independence of the family unit, the state is interfering in familial communications in a way that would be unimaginable in any other context. To justify this interference based on the purported rights of non-custodial parents is specious.
 
 
 77
 I turn now to the majority's upholding of the 48-hour delay rule. The majority's conclusion that the delay requirement is constitutional is based not upon logical analysis, but rather upon three assertions:
 
 
 78
 (1) prolonged delay due to the inaccessibility of abortions in Minnesota is irrelevant;
 
 
 79
 (2) the 48-hour delay requirement may run concurrently with the scheduling of the appointment to perform an abortion; and
 
 
 80
 (3) the delay results only when the minor actually complies with the notification requirement rather than using the bypass procedure.
 
 
 81
 At 1465.
 
 
 82
 The first assertion ignores the reasoning of many courts that have considered other factors peculiar to the region in assessing the constitutionality of waiting periods.[7] The second assertion ignores the possibility that abortion providers could schedule abortions for minors far more quickly absent the delay requirement. The court's final assertion--that there is no delay if the minor uses the bypass procedure--is utterly irrelevant to the issue at hand: whether a 48-hour waiting period, applied to those minors who choose to notify their parents of their decision, imposes an undue burden on the minor's exercise of her constitutional rights.
 
 
 83
 What is most astonishing about the court's discussion of this issue is its complete disregard of pertinent precedent both in this court and the Supreme Court. Specifically, in City of Akron the Supreme Court invalidated a 24-hour waiting period imposed after a woman gave her consent to the abortion and, if a minor, obtained the requisite parental consent. City of Akron, 462 U.S. at 451, 103 S.Ct. at 2503.[8] The Court gave no indication that the statute's waiting period would be constitutional as applied to a minor. Similarly, this court has held a 48-hour waiting period applicable to all women unconstitutional, a holding that the state of Missouri did not appeal. Planned Parenthood Ass'n of Kansas City v. Ashcroft, 655 F.2d 848, 866 (8th Cir.1981), aff'd in part and rev'd in part on other grounds, 462 U.S. 476, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983). Although these cases did not address the precise statute at issue here, the court fails to explain why their principles should not be controlling here. Cf. Indiana Planned Parenthood Affiliates Ass'n, Inc. v. Pearson, 716 F.2d 1127, 1143 (7th Cir.1983) ("[T]he same objections to the waiting periods for adults listed in City of Akron apply to waiting periods for minors.").
 
 
 84
 As long as the Constitution protects the right of a woman to choose to have an abortion, we are under a judicial mandate to evaluate state regulations in terms of whether they impose undue burdens on the exercise of that right. The majority opinion slights this mandate. Here, in dealing with minors, the court should also consider whether the state's interest in protecting minors is furthered by the state regulation. The majority slights this concern as well. The majority has proffered no analysis of whether these interests have been served by the two-parent notification rule. The district court's findings remain unrebutted. The judgment of the district court should be affirmed.
 
 
 85
 HEANEY, Circuit Judge, with whom McMILLIAN, Circuit Judge, joins, dissenting.
 
 
 86
 I respectfully dissent. I agree with the district court that the two-parent notification requirement does not serve the state asserted interests. Indeed, it undermines those interests. The statute does not provide an exception for cases of divorce, separation, desertion or other comparable situations. It thus opens the door to creating intolerable tensions for the minor child at a time when he or she least needs additional stress. I also agree that the two-parent notification requirement cannot be saved by the court bypass procedure.
 
 
 87
 In my view, a single-parent notification requirement would withstand constitutional challenge. It would be a simple matter for the Minnesota legislature to adopt that requirement if it truly believes that a minor will benefit from the counsel of a parent.
 
 
 
 [1]
 Only the constitutionality of the portion of the statute dealing with abortions for minors is at issue
 
 
 [2]
 Subd. (2) provides:
 [N]o abortion operation shall be performed upon an unemancipated minor * * * until at least 48 hours after written notice of the pending operation has been delivered in the manner specified in subdivisions 2 to 4.
 
 
 [3]
 Subd. (2)(a) provides for personal notice by the physician or his agent. In the alternative, subd. 2(b) provides that notice may also be effected by "certified mail addressed to the parent at the usual place of abode of the parent with return receipt requested and restricted delivery to the addressee * * *." If notice is mailed, "[t]ime of delivery [is] deemed to occur at 12 o'clock noon on the next day on which regular mail delivery takes place, subsequent to mailing."
 
 
 [4]
 Subd. 6 provides:
 If subdivision 2 of this law is ever temporarily or permanently restrained or enjoined by judicial order, subdivision 2 shall be enforced as though the following paragraph were incorporated as paragraph (c) of that subdivision; provided, however, that if such temporary or permanent restraining order or injunction is ever stayed or dissolved, or otherwise ceases to have effect, subdivision 2 shall have full force and effect, without being modified by the addition of the following substitute paragraph which shall have no force or effect until or unless an injunction or restraining order is again in effect.
 (c)(i) If such a pregnant woman elects not to allow the notification of one or both of her parents or guardian or conservator, any judge of a court of competent jurisdiction shall, upon petition, or motion, and after an appropriate hearing, authorize a physician to perform the abortion if said judge determines that the pregnant woman is mature and capable of giving informed consent to the proposed abortion. If said judge determines that the pregnant woman is not mature, or if the pregnant woman does not claim to be mature, the judge shall determine whether the performance of an abortion upon her without notification of her parents, guardian or conservator would be in her best interests and shall authorize a physician to perform the abortion without such notification if said judge concludes that the pregnant woman's best interests would be served thereby.
 (ii) Such a pregnant woman may participate in proceedings in the court on her own behalf, and the court may appoint a guardian ad litem for her. The court shall, however, advise her that she has a right to court appointed counsel, and shall, upon her request, provide her with such counsel.
 (iii) Proceedings in the court under this section shall be confidential and shall be given such precedence over other pending matters so that the court may reach a decision promptly and without delay so as to serve the best interests of the pregnant woman. A judge of the court who conducts proceedings under this section shall make in writing specific factual findings and legal conclusions supporting the decision and shall order a record of the evidence to be maintained including the judge's own findings and conclusions.
 (iv) An expedited confidential appeal shall be available to any such pregnant woman for whom the court denies an order authorizing an abortion without notification. An order authorizing an abortion without notification shall not be subject to appeal. No filing fees shall be required of any such pregnant woman at either the trial or the appellate level. Access to the trial court for the purposes of such a petition or motion, and access to the appellate courts for purposes of making an appeal from denial of the same, shall be afforded such a pregnant woman 24 hours a day, seven days a week.
 
 
 [5]
 Subd. 4 provides that no notice is required if:
 (a) The attending physician certifies in the pregnant woman's medical record that the abortion is necessary to prevent the woman's death and there is insufficient time to provide the required notice; or
 (b) The abortion is authorized in writing by the person or persons who are entitled to notice; or
 (c) The pregnant minor woman declares that she is a victim of sexual abuse, neglect, or physical abuse as defined in section 626.556. Notice of that declaration shall be made to the proper authorities as provided in section 626.556, subdivision 3.
 
 
 [6]
 Subd. 7 provides that if any [part of the statute] is held invalid, such invalidity should not affect any portion of the statute which can be given effect without the invalid portion
 
 
 [7]
 On March 2, 1982, the court issued a preliminary injunction against enforcement of subd. 2
 
 
 [8]
 The Court's primary holding in Matheson was that the pregnant minor challenging Utah's abortion notice requirement on the ground that it impermissibly applied to mature or emancipated minors lacked standing to raise that argument since she had not alleged that she or any member of her class was mature or emancipated. Id. at 406, 101 S.Ct. at 1169. The majority opinion did not decide whether a pure notice requirement would be constitutional as applied to emancipated or mature minors. Five justices, however, expressed the view that it would be unconstitutional to apply a notice requirement to minors who could demonstrate their maturity. Id. at 420, 101 S.Ct. at 1177 (Powell, J., concurring); id. at 428 n. 3, 101 S.Ct. at 1181 n. 3 (Marshall, J., dissenting)
 
 
 [9]
 We note that according to the testimony of Paula Wendt, co-director of the Meadowbrook Clinic, parental notification under the statute has increased. Prior to the statute, Wendt testified that approximately 25% of the pregnant minors she counseled told one or both parents of their pregnancy and intended abortion. Since the law has been in effect Wendt testified that about 50% of the minor patients comply with the statute under the court bypass procedure. Since very few minors have been excused under the emancipation or abuse/neglect exceptions, it follows that there has been a marked increase in parental notification. Because the state did not offer any evidence concerning the effects of this notification, we observe only that since the statute has been in place, the percentage of parents notified of their daughters' intended abortion has increased
 
 
 [10]
 Bypass petitions had been filed in 3,573 cases and granted in 3,558 of them. Six petitions were withdrawn, nine petitions were denied and one had been appealed. Of the nine denied petitions, some were apparently justified (e.g., minor didn't really want an abortion/changed her mind), and one was reversed on appeal. The court found that the courts outside the metropolitan areas were more likely to deny the petitions, some being due to the court's unfamiliarity with the system and several involving rather unusual circumstances. Id. at 765
 
 
 [11]
 See Akron, 462 U.S. at 427 n. 10, 103 S.Ct. at 2491, n. 10; Ashcroft, 462 U.S. at 490-93, 103 S.Ct. at 2524-26; Matheson, 450 U.S. at 407-12, 419-25, 101 S.Ct. at 1170-73, 1176-79; Bellotti II, 443 U.S. at 633-40, 99 S.Ct. at 3042-47. See also Zbaraz, 763 F.2d at 1532; Pearson, 716 F.2d at 1133 (7th Cir.1983)
 
 
 [12]
 See, e.g., Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); Storer v. Brown, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974); Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); Elbe v. Yankton Indep. School Dist., 714 F.2d 848 (8th Cir.1983)
 
 
 [13]
 As stated by Justice Stevens:
 If there is no parental-[notice] requirement many minors will submit to the abortion procedure without ever informing their parents. An assumption that the parental reaction will be hostile, disparaging, or violent no doubt persuades many children to bypass parental counsel which would in fact be loving, supportive, and, indeed, for some indispensable. It is unrealistic, in my judgment to assume that every parent-child relationship is either (a) so perfect that communication and accord will take place routinely or (b) so imperfect that the absence of communication reflects the child's correct prediction that the parent will ... [act] arbitrarily to further a selfish interest rather than the child's interest. A state legislature may conclude that most parents will be primarily interested in the welfare of their children, and further, that the imposition of a parental-[notice] requirement is an appropriate method of giving the parents an opportunity to foster that welfare by helping a pregnant distressed child to make and implement a correct decision.
 Danforth, 428 U.S. at 103-04, 96 S.Ct. at 2856-57 (Stevens, J., concurring in part and dissenting in part); see also Matheson, 450 U.S. at 419-20, 101 S.Ct. at 1176-77 (Powell, J., concurring); id. at 424, 101 S.Ct. at 1179 (Stevens, J., concurring).
 
 
 [14]
 The "guiding role" parents have in bringing up their children is explained by Justice Powell:
 [T]he guiding role of parents in the upbringing of their children justifies limitations on the freedoms of minors. The State commonly protects its youth from adverse governmental action and from their own immaturity by requiring parental consent to or involvement in important decisions by minors. But an additional and more important justification for state deference to parental control over children is that "[t]he child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." "The duty to prepare the child for 'additional obligations' ... must be read to include the inculcation of moral standards, religious beliefs, and elements of good citizenship." This affirmative process of teaching, guiding, and inspiring by precept and example is essential to the growth of young people into mature, socially responsible citizens.
 We have believed in this country that this process, in large part, is beyond the competence of impersonal political institutions. Indeed, affirmative sponsorship of particular, ethical, religious, or political beliefs is something we expect the State not to attempt in a society constitutionally committed to the ideal of individual liberty and freedom of choice. Thus, "[i]t is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."
 Unquestionably, there are many competing theories about the most effective way for parents to fulfill their central role in assisting their children on the way to responsible adulthood. While we do not pretend any special wisdom on this subject, we cannot ignore that central to many of these theories, and deeply rooted in our nation's history and tradition, is the belief that the parental role implies a substantial measure of authority over one's children. Indeed, "constitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society."
 Properly understood, then, the tradition of parental authority is not inconsistent with our tradition of individual liberty; rather, the former is one of the basic presuppositions of the latter. Legal restrictions on minors, especially those supportive of the parental role, may be important to the child's chances for the full growth and maturity that make eventual participation in a free society meaningful and rewarding. Under the Constitution, the State can "properly conclude that parents and others, teachers for example, who have [the] primary responsibility for children's well-being are entitled to the support of laws designed to aid discharge of that responsibility."
 Bellotti II, 443 U.S. at 637-39, 99 S.Ct. at 3045-46 (plurality) (citations and footnotes omitted) (emphasis added).
 
 
 [15]
 In Bellotti II, Justice Stevens joined by three other justices concluded that the Massachusetts statute before the Court was unconstitutional because under the statute, as written and construed by the Massachusetts Supreme Court, no minor, no matter how mature and capable of informed decision-making, could receive an abortion without the consent of either both parents or a superior court judge, thus making the minor's abortion decision subject in every instance to an absolute third-party veto. Id. at 652-56, 99 S.Ct. at 3053-55. In comparison, the statute here gives neither a judge nor parents veto power over the minor's abortion decision
 
 
 [16]
 This conclusion is based on somewhat limited factual findings concerning primarily the statute's burden on the minor living in a one-parent household who notified only her custodial parent. The district court also made a finding concerning the minor living in a two-parent home who may have consulted with one parent but, because of fear, not the other. Hodgson, 648 F.Supp. at 764 (finding 49). The court concluded only that instances in which the two-parent notice requirement burdened parent-child communications voluntarily initiated by the minor were "not uncommon." Id. (finding 50). This finding was later characterized as a significant obstacle. Id. at 778. A careful reading of the groups of related findings clearly indicates, however, that the court was primarily considering the impact of the statute on the minor living in a one-parent household who must notify the non-custodial parent. Id. at 764, 768-69 (findings 45-50; 68-72). The court's further discussion underscores this conclusion. Id. at 778
 
 
 [17]
 The Court has recognized two categories of pregnant minors. First, minors who are mature and capable of making an informed decision without parental involvement, the category in which the minor appellees in this case by their pleadings bring themselves, and second, minors who are immature not sufficiently capable of making such decisions; in both categories the best interest of the minor must be considered
 
 
 [18]
 The district court found that the 48-hour delay requirement required a minor, living in a city without an abortion provider, to either travel to a city with an abortion provider twice or spend up to three additional days in the city. The parties do not specify and we are unsure of the evidence in the record to support this statement. According to the manual of Meadowbrook Women's Clinic, when a minor calls seeking information about an abortion she is asked her age and advised of the parental notice law. An abortion may be scheduled over the telephone and at that time, minors are asked how they plan to comply with the statute. If the minor wishes to comply by written notice, the clinic may send the appropriate notice immediately
 
 
 [19]
 Akron, 462 U.S. at 449-51, 103 S.Ct. at 2502-04 (twenty-four-hour waiting period unconstitutional as applied to all women seeking abortions); See also Zbaraz, 763 F.2d at 1537-38 (twenty-four hour waiting period held unconstitutional); Pearson, 716 F.2d 1142-43 (same)
 
 
 [1]
 I concur in section IA. of the majority's opinion, which holds that Minn.Stat. Sec. 144.343(2) is unconstitutional because Minnesota may not require a minor to notify her parents of her intent to have an abortion without providing an alternative court procedure. See Bellotti v. Baird, 443 U.S. 622, 647, 99 S.Ct. 3035, 3050, 61 L.Ed.2d 797 (1979) (Bellotti II )
 
 
 *
 The Honorable Max Rosenn, Senior United States Circuit Judge for the Third Circuit Court of Appeals, sitting by designation
 
 
 [2]
 On cross-appeal plaintiffs urge that as applied the notice/bypass statute as a whole imposes an unconstitutional burden on minors seeking abortions. They challenge the relevance of the Supreme Court's holdings in H.L. v. Matheson, 450 U.S. 398, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981), and Bellotti II, which involved facial attacks on parental consent or notification statutes. But in the interest of judicial restraint the dissent does not need to discuss this issue. It is far better that the Supreme Court make that determination in light of the record. We need to focus only on the two-parent notice Minnesota statute before us
 
 
 [3]
 The district court found:
 The experience of going to court for a judicial authorization produces fear and tension in many minors. Minors are apprehensive about the prospect of facing an authority figure who holds in his hands the power to veto their decision to proceed without notifying one or both parents. Many minors are angry and resentful at being required to justify their decision before complete strangers. Despite the confidentiality of the proceeding, many minors resent having to reveal intimate details of their personal and family lives to these strangers. Finally, minors are left feeling guilty and ashamed about their lifestyle and their decision to terminate their pregnancy. Some mature minors and some minors in whose best interests it is to proceed without notifying their parents are so daunted by the judicial proceeding that they forego the bypass option and either notify their parents or carry to term.
 Some minors are so upset by the bypass proceeding that they consider it more difficult than the medical procedure itself. Indeed, the anxiety resulting from the bypass proceeding may linger until the time of the medical procedure and thus render the latter more difficult than necessary.
 
 
 [648]
 F.Supp. at 763
 
 
 [4]
 See, e.g., at 1463 ("The Supreme Court has never indicated that [the interests of parents in the rearing and welfare of their children] are contingent upon the parent having custody of the child."); id. at 1464 ("[T]he principles enunciated by the Supreme Court as to the parental role [apply] to non-custodial parents as well as custodial parents.")
 
 
 [5]
 In equating the rights of non-custodial parents with those of custodial parents, the majority ignores basic principles of child custody law. The fact is that the legal rights of non-custodial parents are indeed inferior to those of custodial parents:
 [T]he parent with "legal custody" has the right to make decisions about the child's education, religious training, residence, and medical treatment. Generally, this parent also has "physical" or "actual" custody which entitles her to control the child's daily activities such as sleeping, eating, and recreation. The rights and obligations of the non-custodial parent are a good deal more limited. Typically, that parent loses all power with respect to major decisions.
 Wexler, Rethinking the Modification of Child Custody Decrees, 94 Yale L.J. 757, 808 (1985) (emphasis added; footnote omitted).
 
 
 [6]
 The Supreme Court itself has recognized that concerns for the integrity of the family may be far different when that family no longer conforms to the customary structure. See Bellotti II, 443 U.S. at 649, 99 S.Ct. at 3051 ("At least when the parents are together and the pregnant minor is living at home, both the father and the mother have an interest--one normally supportive--in helping to determine the course that is in the best interests of a daughter.") (plurality) (emphasis added)
 
 
 [7]
 The Seventh Circuit recently summarized this reasoning:
 These cases hold that a waiting period places a direct and substantial burden on women who seek to obtain an abortion. This burden is the same for minors as for adults, Bellotti II, 443 U.S. at 642, 99 S.Ct. at 3047; Charles v. Carey, 627 F.2d [772, 785 (7th Cir.1980) ], and therefore "the same objections to the waiting periods for adults listed in City of Akron apply to waiting periods for minors." [Indiana Planned Parenthood v.] Pearson, 716 F.2d [1127, 1143 (7th Cir.1983) ]. The burden imposed by a waiting period has been reiterated with little variation in these cases. The District Court of Rhode Island cogently discussed several factors which it considered part of this burden in Women's Medical Center of Providence, Inc. v. Roberts, [530 F.Supp. 1136 (D.R.I.1982) ], stating
 Although a mere twenty-four hour delay by itself may not increase the risk of an abortion to a statistically significant degree, the record in this litigation shows that the mandatory wait may combine with other scheduling factors such as doctor availability, work commitments, or sick leave availability, to increase the actual waiting period to a week or more.... [I]t is uncontested that delays of a week or more do indeed increase the risk of abortion to a statistically significant degree.... Furthermore, a delay of even twenty-four hours may push a woman into the second trimester, thus requiring that the operation be performed in a hospital, and significantly increasing the procedure's cost, inconvenience, and, of course, risk.
 
 
 [530]
 F.Supp. at 1146
 Courts have also noted that difficulties in scheduling may be complicated by the distance which a woman may have to travel in order to obtain an abortion. An extreme example of this was before the District Court of North Dakota in Leigh v. Olson, [497 F.Supp. 1340 (D.N.D.1980) ], in which the district court found that only one doctor in the entire state performed abortions and that women in certain parts of the state would have to drive some 400 miles in order to obtain an abortion. 497 F.Supp. at 1347. Finally, the cases cited above have noted that a waiting period may result in additional mental anguish for a significant number of women seeking abortions. See, e.g., [id.] at 1347 n. 8 and accompanying text.
 Zbaraz v. Hartigan, 763 F.2d 1532, 1537 (7th Cir.1985) (footnote omitted), aff'd per curiam by an equally divided court, --- U.S. ----, 108 S.Ct. 479, 98 L.Ed.2d 478 (1987). The Zbaraz court also listed the "plethora" of cases striking down waiting periods. Id. at 1536.
 
 
 [8]
 The ordinance at issue in City of Akron provided:
 "No physician shall perform or induce an abortion upon a pregnant woman until twenty-four (24) hours have elapsed from the time the pregnant woman, and one of her parents or her legal guardian whose consent is required in accordance with Section 1870.05(B) of this Chapter, have signed the consent form required by Section 1870.06 of this Chapter, and the physician so certifies in writing that such time has elapsed."
 Id. at 424 n. 6, 103 S.Ct. at 2489 n. 6 (emphasis added).